CONTINENTAL OIL COMPANY, a corporation, and Gulf Oil Corporation, a corporation, Plaintiffs,

v.

AMERICAN QUASAR PETROLEUM CO. OF NEW MEXICO, a corporation, Defendant.

No. C76–218B.

United States District Court,
D. Wyoming.

Oct. 21, 1977.

Houston G. Williams of Wehrli & Williams, Casper, Wyo., Floyd E. Radloff, Continental Oil Co., Denver, Colo., and E. S. Hurst, Gulf Oil Corp., Houston, Tex., for plaintiffs.

Glenn Parker and James L. Applegate of Hirst & Applegate, Cheyenne, Wyo., for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT

BRIMMER, District Judge.

The Plaintiffs, Continental Oil Company (Conoco), as the lessee of two oil and gas leases covering 640 acres in Converse County, Wyoming, and Gulf Oil Corporation (Gulf), as the assignee of the lessee's interest in an oil and gas lease of a 640 acre State school section in Converse County, Wyoming, entered into a formal agreement on August 17, 1973 with Chaparral Resources, Inc. (Chaparral), and on August 21, 1973 Chaparral contracted with American Quasar Petroleum Co. of New Mexico (American Quasar) to deliver the farmouts to it in return for a $10,000 finder's fee and 1/32nd of 5/8th overriding royalty. In return American Quasar agreed to drill the test well "at its sole risk and expense", as required by the farmout agreement from the Plaintiffs.

American Quasar drilled the test well to a depth of 12,841 feet, when it blew out of control on November 30, 1973 and caught fire on December 5, 1973. The cost and expense of controlling the fire was at least $1,626,956.65, and American Quasar incurred extra expenses of at least $941,454.19 for regaining the well's depth prior to the blowout of 12,841 feet. Claims for those amounts, less specified deductible sums, were made by American Quasar against the Underwriters at Lloyds, London and British Insurance Companies, London, England, under a policy of well control insurance for the total face amount of $3,000,000.00, with an extra-expense endorsement, for which American Quasar had paid a premium of $887,198.78, with an advance premium of $750,000.00 on an audit-type policy, which eventually cost American Quasar a net sum of $361,125.00 after the policy had been audited in 1976. That policy was written for a term of 1 year from November 8, 1973, covering "all well(s)" located within "Areas I and II as defined." The premium rates specified varied for those areas, as did the specified deductible covenants and co-insurance amounts. Area II was defined as including "Wyoming, Utah, Montana, New Mexico, Colorado, Arizona, Texas, Louisiana, Mississippi, Alabama, Florida, Alaska," parts of Canada and Lake Maracaibo and "all other land areas worldwide other than those North of Artic Circle and South of Antartic Circle." (Policy, p. 3). Because the policy, attached to Defendant's Answers to Interrogatories as Exhibit F, has the word "renewed" written on it, and in Answer to Question 2P reference is made to the premium for the "preceding year," one concludes that this was a policy which American Quasar had taken out prior to 1973 and had had renewed annually, and that American Quasar

had not obtained the policy specifically for the Patterson No. 1 Test Well, but obtained it for the purpose of covering all of its wells in an extremely large area of the world. The insurers paid American Quasar a total of $2,067,753.79 for control of and extra expense on Patterson No. 1 Well. The well was controlled on January 2, 1974, at which time the extra expense operations commenced and continued until April 4, 1974 when the original total depth was obtained (Exhibit D, Defendant's Interrogatories).

The farmout agreement of August 17, 1973 required the test well to be commenced in 30 days after that date. It provided in Paragraph 3 that, "all costs and expenses incurred in drilling, testing, completing, equipping and, if dry, of plugging and abandoning any test well drilled hereunder shall be the sole responsibility of Farmoutee (Chaparral), and Farmouters (the plaintiffs) shall never be liable for any part thereof." Paragraph 5 provides that in the event of production of oil or gas, the Farmouters shall be deemed to have relinquished their interest in return for ⅟₁₆th of all production until such time as the value of production, after payment of royalties, taxes and operating costs, equals the cost of drilling, testing, completing and equipping the well, and that when payout is achieved, the Farmouters were given the option to convert one-half of the overriding royalty to a 25% working interest in such well. The Farmoutees also agreed to indemnify and hold harmless the Farmouters against any loss, cost or expense of any kind in connection with its operations. The instructions attached to the farmout agreement required the Defendant to clean and restore the premises to as near the original condition as reasonably possible.

The farmout agreement further provides that any assignment of operating rights and working interest to Chaparral shall be subject to an operating agreement attached thereto "which . . . shall govern the rights and obligations of the parties . ." That agreement names American Quasar as the operator, giving it full control and requiring it to conduct its operations in a good and workmanlike manner and pro-

ceeding that "it shall have no liability as operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from willful misconduct." (Paragraph 5, Operating Agreement). The operator is required to pay all costs and expenses incurred in the development of the contract area, billing the other parties for their respective shares, with specified limitations upon such expenditures, "provided, however, that, in case of explosion, fire, flood or other sudden emergency, . . . operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property, . . ." (Paragraph 11, Operating Agreement). The parties also agreed that "the entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions that their respective interests . . . bear to the total interests of all Consenting Parties." (Paragraph 12, Operating Agreement). Paragraph 20 of the Operating Agreement provides that each party ". . . shall be liable only for its proportionate share of the costs of developing and operating the Contract Area." As to insurance, the only provision is that of Paragraph 25 which reads, "Operator shall carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit 'D' attached to and made a part hereof." Exhibit "D" to the Operating Agreement provides only for employers' liability (Workmen's Compensation) insurance, comprehensive and automobile liability insurance, protection and indemnity insurance for marine vessels and comprehensive general public liability insurance, but states that, "operator shall not carry physical damage insurance on jointly owned property, it being . . . agreed that each party will be responsible for its own interest in such properties and *will assume its portion for any loss that occurs.*" (Emphasis supplied).

By an agreement of August 20, 1973 assignment of the interests of Chaparral to American Quasar was approved. Thereafter on August 30, 1973 the parties executed

a pooling agreement by which "Quasar hereby agrees to the commencement of this initial test well within the time limit at its sole risk and expense." It also provided that it was not intended to create a partnership or joint venture between the parties and that the rights and liabilities of Quasar and Chaparral were separate and several.

The Plaintiffs, Conoco and Gulf, base their claims upon the farmout agreement's language providing that this interest shall be a net overriding royalty of 1/16th of production until Defendant American Quasar has recovered costs of drilling, testing, completing and equipping the well, and that the Defendant American Quasar's actual cost was the cost it expended less the amount recovered from its insurance proceeds. Defendant American Quasar denies that Plaintiffs have any right to the insurance proceeds and contends that any claim allowed Plaintiffs to the insurance proceeds would constitute a windfall and unjust enrichment. Both parties have sought a declaratory judgment, and both have moved for a summary judgment, submitting affidavits in support thereof. Both parties concede by such motions that there are no material facts in issue, and the Court so finds.

It is first necessary to determine the meaning of the parties in the farmout agreement with respect to "all costs and expenses incurred in drilling, testing, completing, equipping . . . any test well drill hereunder . . ." which were the sole responsibility of the farmoutee, for which farmouters would never be liable, according to the contract. This language must be read in the light of the objectives of the contracting parties, which was that Conoco and Gulf were to get a free well, the cost of which would be paid out of production, if any was discovered. It must also be read in conjunction with the provision requiring Quasar, as farmoutee, to indemnify and hold harmless Conoco and Gulf, with the operating agreement giving American Quasar full control of the operations, and with the clauses requiring American Quasar to conduct its operations in a

good and workmanlike manner, paying all costs and expenses incurred in the development of the contract area, and requiring American Quasar to clean and restore the premises to their original condition. That language seems clear and unambiguous. It means that American Quasar not only had to pay the costs of drilling and testing Patterson No. 1 Test Well but also that American Quasar had to pay the cost of the blowout and regaining the well's depth, if not alone for the purpose of controlling production so that it would be marketed under the terms of the operating contract, then for the purpose of enabling the well to be tested in a good workmanlike manner and restoring the premises if for some reason it was not a commercial well. In addition, the operating agreement also authorized American Quasar as the operator to incur such expenses as required to deal with the emergency.

American Quasar's insurance premiums for its well control policy cannot be said to be part of "all costs and expenses incurred in drilling, testing . . . ." We find that the policy was not taken out specially for this well. It was a policy insuring company-wide operations in a large area of the world. The test well, by the terms of the farmout agreement, had to be started 30 days after August 17, 1973. The policy did not have its inception in that time period. Instead it was apparently renewed on November 8, 1973 for a one year term. The actual premium, because of the retrospective premium adjustment audit feature of the policy, was not finally determined until 1976 and then after consideration of footage credits for the total amount of footage drilled by American Quasar per annum and different rates for each of Areas I and II depending on whether American Quasar wells in those areas were less than 10,000 feet, or between 10,000 and 17,499 feet, or over 17,500 feet. The well control insurance policy was part of American Quasar's cost of doing business, but surely the premium for it was not a cost of drilling and testing Patterson No. 1 Well.

■ The farmout agreement provided that in return for drilling the test well, Conoco and Gulf should assign to American Quasar an undivided one-half of their working interest. American Quasar became a co-lessee of the three leases in question by the assignments of lease interests from the lessees, when the assignments were filed for approval with the State of Wyoming, as lessor (Exhibit E, Plaintiff's Complaint). We assume such approval was granted. The farmout agreement is an executory contract. Brown, *Southwestern Legal Foundation Fifth Annual Institute* 25, pp. 69–70 (1954). Since this agreement specifically provides that it is not a partnership or joint venture relationship, even though no transfer occurs until the drilling obligation has been met, this type of sharing arrangement is more like that of lessor-lessee or vendor-vendee than any other, and the same rules should be applicable. See 2 *Williams and Meyers*, Oil and Gas Law, Sections 432–432.2.

■ The general rule governing the right to division of insurance proceeds between lessor and lessee is that in the absence of an agreement to insure, the proceeds of insurance taken out by one of them cannot be claimed by the other. 44 *Am.Jur.2d*, Insurance, Section 1763. Appleman states that such a policy is a personal contract, which does not run with the land and which,

". . . because of the personal nature of the contract, insurance by one in his own right does not, in the absence of a contract, inure to the benefit of another. Plus the mere fact that another person, also possessing an insurable interest, likewise suffered a heavy loss by destruction of their property, does not alter the insured's rights. Accordingly, one not named as an insured cannot maintain an action on the policy, and a person having no interest in the contract and not showing a clear right`to participate in the proceeds thereof can establish no recovery therein." *Appleman on Insurance*, Section 3331.

There are no Wyoming cases establishing this general principle as the substantive law of this State, but it is a well-established rule, which there is no reason to believe the Wyoming courts would not follow.

The Plaintiffs urge that principles relating to contractors' risks in building contracts are applicable by analogy. In those cases the builders "costs" are held to be the builder's actual costs, so that owners get the benefit of things such as contractor's discounts. The Plaintiffs also argue that since builder's risk insurance policies provided by a contractor are held to cover an insurable interest where the contractor has a duty to complete the contract, by analogy, since American Quasar had the risk of loss, it had an insurable interest entitling it to receive the insurance proceeds but that it could not charge the blowout cost for which it was paid by its insurer, to the Plaintiffs' interest in the well because that would be an unjust enrichment. The application of those cases here is different. The contract here does not define "costs" as "actual costs" or "unreimbursed costs" but merely infers to "all costs." Also, it is obvious that both Plaintiffs and Defendant had an insurable interest in the well. Plaintiffs certainly did since their part of the production of the well must be used to pay the well control expense and expense of regaining the original depth of 12,841 feet. They apparently chose not to do so, or to be self-insurers. On the other hand, American Quasar as a company policy, carried well control insurance for which it paid a large advance premium. American Quasar cannot be said to have been unjustly enriched when it merely received no more than its due under the indemnity contract it had purchased. *Restatement on Restitution*, Section 107(a).

■ A more apt analogy is that suggested by *Couch on Insurance 2d*, Section 29:97–98, and Section 29:102, where the rights of a vendor and vendee with respect to insurance purchased by them are discussed. "Where insurance is maintained by the vendor in his own name, and the loss

**914**

would fall upon him, he is entitled to collect and retain the insurance money, in the absence of an agreement to the contrary . . ." *Ibid*, Section 29:98. Also, "in the absence of any duty on the part of the vendee to effect insurance for the protection of the vendor, the vendee alone is entitled to the proceeds of a policy effected by him in his own name to protect his own interest, providing the vendor has no special equitable rights to the insurance fund." *Ibid*, Section 29:102. See also *Anno.* 64 ALR 2d. 1402, and *Hartford Fire Ins. Co. v. Cagle* (10 CA, 1957), 249 F.2d. 241, in which this principle is recognized. We think that these principles should control this case, and that in the absence of any duty on the part of the farmoutee, American Quasar, to procure well-control insurance for the protection of the farmouters (and we note that the insurance schedule attached as Exhibit D to the operating agreement did not list well-control insurance as one of the types of coverage American Quasar was obligated to procure), the farmoutee is entitled to the proceeds of the policy effected by it in its own name to protect its own interests. We find no special equitable rights here that would warrant equitable remedies, such as a constructive trust of the insurance recovery by American Quasar for the benefit of the Plaintiffs.

IT IS THEREFORE ORDERED that the Defendant's Motion for Summary Judgment be, and the same hereby is, granted, and Summary Judgment will be entered accordingly.